IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| TERRANCE MCBRIDE, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-17-3433 |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | * | |
| | * | |
| Defendant. | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Terrance McBride, an African-American man, worked for Washington Metropolitan Area Transit Authority ("WMATA") as a plumber until WMATA terminated his employment "for falsifying reports and for his unauthorized absence from the worksite." Def.'s Stmt. of Facts ¶¶ 1, 11, ECF No. 28-2; Pl.'s Resp. to Stmt. ¶¶ 1, 11, ECF No. 29-1. His termination followed an investigation of him, two African-American co-workers, and two Caucasian co-workers "for potential misconduct." Pl.'s Opp'n 4, ECF No. 29; Def.'s Reply 4 n.1, 5, ECF No. 33. He views his termination as discriminatory because WMATA terminated the employment of the three African Americans but not the Caucasians. Am. Compl. ¶ 33, ECF No. 10. He filed suit, alleging race discrimination based on his termination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Compl., ECF No. 1. Now pending is the Motion

for Summary Judgment, ECF No. 28, that WMATA filed.[1] Because Mr. McBride cannot prevail on his claim as a matter of law, I will grant Defendant's motion.

## **Factual Background**[2]

Terrance McBride, an African American, worked for WMATA as a plumber, beginning in 2003. Def.'s Stmt. of Facts ¶ 1; Pl.'s Opp'n 4; Def.'s Resp. to Requests for Admissions 1, ECF No. 29-4. WMATA assigned McBride, along with Ronald Bellamy and Tyrone Gibson, both of whom are African American, and David Eichen and Thomas McCaskill, both of whom are Caucasian, to work the night shift in 2015. Pl.'s Opp'n 4; Defs.' Reply 4 n.1 &5; Def.'s Stmt. of Facts ¶¶ 5, 19; Def.'s Resp. to Requests for Admissions 1, 7–10. They worked as a crew "performing maintenance checks on fire suppression systems in locations operated by Defendant and repairing those systems as necessary." Am. Compl. ¶ 21.

Andre Jordan, the Assistant Superintendent of McBride's department at WMATA, stated that he had "observed employees in Plaintiff's crew at the end of their shift coming in late, with red eyes, and disheveled clothes." Def.'s Stmt. of Facts ¶ 3; Pl.'s Resp. to Stmt. ¶ 3. As a result, WMATA investigated all five employees "for potential misconduct." Pl.'s Opp'n 4; Def.'s Reply 5; *see also* Def.'s Reply 4 n.1 (noting that these "evening shift plumbers were under investigation by their supervisors for sleeping on the job").

During the evening shift beginning May 17, 2015, the crew had been assigned to work at WMATA's Southern Avenue Station. Pl.'s Opp'n 4; Defs.' Reply 4 n.1 &5; Def.'s Stmt. of Facts

---

[1] The parties fully briefed the motion. ECF Nos. 28-1, 29, 33. A hearing is not necessary. *See* Loc. R. 105.6.

[2] To decide WMATA's Motion for Summary Judgment, I consider the facts in the light most favorable to Mr. McBride as the non-moving party, drawing all justifiable inferences in his favor. *Ricci v. DeStefano,* 557 U.S. 557, 585–86 (2009).

¶¶ 5, 19. All five crew members completed their work and left the worksite at the same time early in the morning on May 18, 2015, before their shifts ended. McBride Dep. 76:10–19, 77:2–3, ECF No. 29-2. After that, WMATA took disciplinary measures and terminated the employment of all three African Americans but not the Caucasians, leading McBride to believe that the termination was discriminatory. Am. Compl. ¶ 33.

I will discuss the facts concerning the individuals' actions and repercussions in the discussion below, in the context of the elements that McBride must prove to prevail on his claim for racial discrimination.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Cole v. Prince George's Cty.*, 798 F. Supp. 2d 739, 742 (D. Md. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).

**Discussion**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discrimination using direct evidence or under the *McDonnell Douglas*[3] burden-shifting approach. *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526–27 (D. Md. 2015), *aff'd as modified,* No. 15-2067, 2016 WL 4750626 (4th Cir. Sept. 13, 2016); *see Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284 (4th Cir. 2004). "Under either avenue of proof, the focus is on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision." *U.S. Equal Employment Opportunity Comm'n v. Dimensions Healthcare Sys.*, No. PX-15-2342, 2016 WL 4593470, at *3 (D. Md. Sept. 2, 2016) (citing *Sawicki v. Morgan State Univ.*, No. WMN-03-1600, 2005 WL 5351448, at *6 (D. Md. Aug. 2, 2005), *aff'd*, 170 F. App'x 271 (4th Cir. 2006)).

McBride does not contend that there is direct evidence of discrimination. Pl.'s Opp'n 8. Accordingly, under the *McDonnell Douglas* burden-shifting framework, he must first make out a *prima facie* case of race discrimination. *Wright v. Sw. Airlines*, 319 F. App'x 232, 233 (4th Cir. 2009). If he does so, the burden shifts to the employer, which must "proffer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* The burden then shifts back to McBride "to prove by a preponderance of the evidence that the proffered reasons were pretextual." *Id.* at 233.

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

4

The elements of a prima facie case of race discrimination under Title VII are "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) less favorable treatment than similarly situated employees outside the protected class." *Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, No. JKB-10-276, 2011 WL 4549177, at *5 (D. Md. Sept. 28, 2011) (citing *White v. BFI Waste Servs.,* 375 F.3d 288, 295 (4th Cir. 2004)); *see also Coleman*, 626 F.3d at 190. A plaintiff is "not required as a matter of law to point to a similarly situated . . . comparator [outside the protected class] in order to succeed on a race discrimination claim." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.,* 333 F.3d 536, 545 (4th Cir. 2003) (noting that in *Dennis v. Columbia Colleton Med. Ctr. Inc.*, 290 F. 3d 639, 648–49 n.4 (4th Cir. 2002), the Fourth Circuit held that a "plaintiff need not prove that she was better qualified than a successful applicant if other circumstantial evidence suggests discrimination"); *see also Mabry v. Capital One, N.A.*, No. 13-2059-AW, 2013 WL 6410983, at *2 (D. Md. Dec. 6, 2013) (noting that comparison to similarly situated employees "is the general rule" and not a "categorical requirement"). Here, however, McBride has chosen to base his claim on the fact that he and two other African-American employees were fired when two Caucasian employees were not, under circumstances that McBride contends are similar. Am. Compl. ¶ 33; *see also* Pl.'s Opp'n 5–6 ("As a result of the similarities in position and conduct, specifically leaving the worksite without authorization, Mr. Eichen and Mr. McCaskill are proper comparators for Mr. McBride and they both should have been investigated for misconduct by Defendant as Mr. McBride was."). And, WMATA focuses its challenge on the fourth element, insisting that "Plaintiff's *prima facie* case fails because there is no proper comparator." Def.'s Reply 4. Thus, the issue is whether either Eichen and McCaskill, who are Caucasian, can serve as a "similarly situated employee." *See Linton*, 2011 WL 4549177, at *5.

"[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel" and thereby "isolate the critical independent variable: complaints about discrimination." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008); *Bell v. Univ. of Md. Coll. Park Campus Facilities Mgmt.*, No. PX-17-1655, 2018 WL 3008325, at *8 (D. Md. June 14, 2018) (quoting *Humphries*). Therefore, "[c]omparators must be 'similar in all relevant respects,' including being subject to the same supervisors and performance standards, and having 'engaged in the same conduct without [meaningful] differentiating or mitigating circumstances.'" *Caban v. MET Labs., Inc.*, No. JKB-17-1872, 2019 WL 2146915, at *10 (D. Md. May 16, 2019) (quoting *Haywood v. Locke*, Civ. No. 09-1604, 387 F. App'x 355, 359 (4th Cir. 2010)). Thus, I must consider Eichen and McCaskill's disciplinary histories and their actions early in the morning on May 18, 2015, in comparison to McBride's, to determine whether they are similarly situated.

Eichen and McCaskill were on the same crew as McBride, worked with him on the evening shift that began May 17, 2015, and left the worksite when he did. With that, however, their similarities end.

*Mr. McBride*

Five sources provide five distinct accounts of Mr. McBride's whereabouts and the timing of his return to the Carmen E. Turner Maintenance and Training Facility in Landover, Maryland ("CTF") on the early morning of May 18, 2015: video surveillance, two employment records that McBride completed on May 18, 2015, a grievance that McBride wrote on July 1, 2015, and McBride's deposition testimony on May 1, 2018. The two records McBride completed that night are a daily activity report and a vehicle trip log. A daily activity report is a report, completed by

6

the employee, that "describes the employee's activity for their work shift," Jordan Dep. 18:1–2, 18:22–19:1. The vehicle trip log, like the daily activity report, is completed by the employee. *Id.* at 18:16–21. "It's a log that's used to document [the employee's] time, where [he] arrive[s], multiple stations—like, if [he] go[es] to multiple stations, [he is] supposed to write down the times that [he] get[s] there and the location." *Id.* at 18:8–12.

The video surveillance shows that McBride returned to CTF at 12:45 a.m. on May 18, 2015. Jordan Decl. ¶ 11. And, at approximately 3:30 a.m. that morning (which was three hours before McBride's shift ended, McBride Decl. ¶ 2, ECF No. 29-7), "the vehicle assigned to Mr. McBride was observed in the parking lot at [CTF]." Jordan Decl. ¶ 7. McBride was not in his assigned vehicle when it was discovered. *Id.* ¶ 10. WMATA retrieved the trip log from the vehicle at that time. Def.'s Stmt. of Facts ¶ 7; Pl.'s Resp. to Stmt. ¶ 7.

The trip log stated that McBride remained at the Southern Avenue Station location until 6:30 a.m., Def.'s Stmt. of Facts ¶ 7; Pl.'s Resp. to Stmt. ¶ 7, which matched neither the surveillance video (placing McBride at CTF at 12:45 a.m.) nor the location of the vehicle at 3:30 a.m. when it was discovered (CTF). The trip log also did not match McBride's daily activity report, in which he claimed that he finished working at the Southern Avenue Station at 2:30 a.m., earlier than reported in the trip log (6:30 a.m.) but later than the video surveillance showed (12:45 a.m.). Def.'s Stmt. of Facts ¶ 8; Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 8.

Thus, the employment records contradict the video surveillance—and each other. McBride does not try to argue that a reasonable jury should accept his account of the events over the video surveillance, as indeed he cannot. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (noting that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment," and therefore, when the record contains video footage that is not open to more than one interpretation and contradicts the non-movant's assertions, the Court "view[s] the facts in the light depicted by the videotape"); *Glascoe v. Sowers*, No. ELH–11–2228, 2013 WL 5330503, at *5 (D. Md. Sept. 20, 2013) (observing that, when videotapes "clearly depict the events at issue, they will prevail over contrary evidence submitted by either side"). Rather, he attempts to explain the discrepancies.

According to McBride, "the trip log in question was not finalized at the time that it was taken." Pl.'s Resp. to Stmt. ¶ 7. He provides a Declaration to support his position that the trip log was not false, but merely unfinished, and that he informed his supervisors that he was not planning to turn it in without revising it:

> 6. I customarily completed my vehicle trip log at the beginning of my shift based upon my estimation of where I would be driving during my shift.
>
> 7. If I ultimately was incorrect in my initial estimate, I simply corrected the trip log to accurately represent what actually happened during my shift before leaving work at the end of my shift.
>
> 8. During the night shift which began on May 17, 2015, I was employing this method of completing my paperwork, as I routinely did. As a result, I had tentatively filled in my vehicle trip log with my estimation of how my shift would go.
>
> 9. I explained this to my supervisors when questioned during my shift on May 17, 2015 and requested that I be allowed to complete my vehicle trip log with the correct information but was denied.

McBride Decl., ECF No. 29-7. Setting aside the self-serving nature of this Declaration, I note that it explains only the inaccurate time listed in the *trip log*; it does not explain why McBride's *daily activity report* stated that he did not complete his work until 2:30 a.m., when the video surveillance showed him returning to CTF at 12:45 a.m.

8

McBride also attempted to account for his time between 12:45 a.m. and when his supervisors located him after 3:30 a.m. First, in his July 1, 2015 grievance, in which he asserted that WMATA wrongfully terminated his employment, he stated that he had gone to check on a gas leak in WMATA's Building 2 and "saw someone that [he] knew and started talking with them." McBride Dep. Ex. 27, ECF No. 29-2, at 115. Then, McBride testified that, after he completed his work, he returned to CTF and then "g[ot] in the truck with [Bellamy] . . . to go to Checkers and get [himself] a milkshake." McBride Dep. 77:9–20. He explained:

> And at the time, Checkers was closed I believe. And on the way back, he was going to drop me off at the yard.
>
> And I decided I was going to check on that gas leak that's at the building directly across the street, like I wrote in my notes. And I never made it in the building, which I explained to [my supervisors] because I was standing outside of it talking [with] . . . a guy from the neighborhood that I hadn't seen in a long time.

*Id*. at 77:20–78:8.

He insists that these statements are not contradictory: First he went to Checkers, and then he went to check on the gas leak in Building 2 but ended up in conversation outside the building. *See id.*; Pl.'s Resp. to Stmt. ¶¶ 12–14. Taking the deposition testimony and the grievance in the light most favorable to McBride, they can be read to be consistent with each other, telling the story that Plaintiff suggests. But, they are inconsistent with McBride's trip log and daily activity report, which stated that he was at the Southern Avenue Station—not in front of Building 2—until 2:30 or 3:30 a.m. Further, they do not eliminate the contradiction between the daily activity report and the trip log, or the two reports and the video surveillance. As noted, the Court cannot accept any of McBride's versions of events over the video surveillance. *See Scott*, 550 U.S. at 380–81. Neither could a reasonable jury accept his smorgasbord of conflicting explanations in the face of that video. *See Loney v. Miles*, 213 F.3d 631, 2000 WL 530319, at \*3 (4th Cir. 2000) (Table)

(concluding that, where witness's "deposition thoroughly contradict[ed] his earlier affidavits, he [did] not create an issue of material fact" because the court "may disregard an affidavit that is inherently inconsistent with deposition testimony" (citing *Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975-76 (4th Cir. 1990)); *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

Moreover, what McBride's grievance and deposition testimony do establish is that McBride spent part of the night going to Checkers and then having a personal conversation outside Building 2. Notably, Jordan testified that the penalty for being absent without authorization "[d]epend[s] on the egregiousness of it," and he agreed that "if an employee is absent from the worksite without authorization, but they're still in a WMATA facility, that would be looked upon as less severe [than] an employee who was absent from the worksite and went to go and do their own personal business." Jordan Dep. 36:15–37:3, 37:13–20.

And, regardless where McBride actually was, it is undisputed that, when McBride's assigned vehicle was observed at CTF, "Plaintiff was not with the vehicle, was not in the shop area, and took approximately 45 minutes to report to his supervisor after a call went to voicemail." Def.'s Stmt. of Facts ¶ 9; Pl.'s Resp. to Stmt. ¶ 9. McBride claims that WMATA "refused to provide [him] with a pager to use on the night in question as [he] had … requested … requiring him to rely on his personal mobile phone for communication with his supervisor." Pl.'s Resp. to Stmt. ¶ 9.

Following the investigation, WMATA terminated McBride's employment on June 15, 2015, stating that his employment was terminated "for falsifying reports and for his unauthorized

absence from the worksite." Def.'s Stmt. of Facts ¶ 11; Pl.'s Resp. to Stmt. ¶ 11; Jordan Decl. ¶¶ 13, 15. The letter notifying him of the termination memorialized his prior disciplinary history. Term. Ltr., ECF No. 38-2, at 6. In March 2006, he had "received a three (3) day suspension for poor workmanship"; in January 2007, he had been suspended for three days for being absent without leave; and in February 2007, he had "received a three (3) day suspension for violating roadway safety rules by failing to set up the high voltage warning strobe." *Id.*; *see* Def.'s Stmt. of Facts ¶ 15; Pl.'s Resp. to Stmt. ¶ 15. The termination letter stated that he was terminated "[a]s a result of [his] gross misconduct and [his] continued inability to follow workplace rules." Term. Ltr.

McBride asserts that the prior actions "occurred more than five years prior to [his] termination" and therefore, in his view, were not material. Pl.'s Resp. to Stmt. ¶ 15; *see* Def.'s Resp. to Requests for Admission 18. Yet, following the March 2006 incident, McBride signed a letter that he received from WMATA, acknowledging that the suspension would be "made a part of [his] work history for *all* appropriate progressive discipline purposes." McBride Dep. 43:3–21(emphasis added). And, when asked whether, "[b]ased upon WMATA's disciplinary policies, . . . an employee's history of prior discipline [is] usually considered when making additional disciplinary decisions," Jordan answered: "Usually." Jordan Dep. 14:1–5.

As for how the level of disciplinary action is determined, Jordan testified that WMATA has a "disciplinary matrix" that provides a "guideline" for disciplinary actions such as those imposed following the investigation of the five employees. Jordan Dep. 8:11, 9:5–10:1, ECF No. 28-5. As noted, the penalty for being absent without authorization "[d]epend[s] on the egregiousness of it," *id.* at 36:15–37:3, and "if an employee is absent from the worksite without authorization, but they're still in a WMATA facility, that would be looked upon as less severe

[than] an employee who was absent from the worksite and went to go and do their own personal business," *id.* at 37:13–20. Jordan testified that it was his understanding that the penalty for falsification of documents "is termination" and that he did not know of anyone who was found to have falsified documents whose employment was not terminated. *Id.* at 44:7–21, 45:7–10.

*Mr. McCaskill*

In the early morning hours of May 18, 2015, a supervisor called McCaskill and inquired about his whereabouts, and McCaskill said that "[h]e was at a [metro] station doing a preventive maintenance check." Jordan Dep. 16:11–17:10. Notably, WMATA policy is that, if a plumber sent to a location to work completes the work at that location, the plumber can either perform "[p]reventative maintenance on a station . . . to make sure it's operational" or "[c]all [the] supervisor for a[n] . . . [a]dditional assignment." Jordan Dep. 34:3–21. If the plumber chooses to perform preventative maintenance after completing a job, the plumber does not need permission to do so. *Id.* at 34:22–35:4. Thus, "going to do preventative maintenance after [a plumber has] completed [a] job assignment is not misconduct," even if the plumber "leave[s] the site where the original task that [he or she] was assigned was performed and go[es] to another site, which is a different WMATA station, to perform preventative maintenance duties" and does not inform anyone. *Id.* at 35:10–36:8.

WMATA used McCaskill's "[d]aily activity, located log, and the vehicle trip log" to confirm his location. *Id.* at 17:13–20; *see also id.* at 15:20-22 ("That particular night Mr. McCaskill was responsible in returning a phone call and returning back to the shop on time. And his documents proved it."). Because of "his timeliness responding and his paperwork that was turned in," McCaskill, who had no prior disciplinary history, was not disciplined. *Id.* at 19:2–13. McBride admits that "Mr. McCaskill was accused of absolutely no wrongdoing whatsoever related

to the evening shift beginning on May 17, 2015," and before that night, he "had never been investigated or considered by management for any potential misconduct at WMATA." Pl.'s Resp. to Stmt. ¶¶ 21–22; *see* Def.'s Stmt. of Facts ¶¶ 21–22.

Thus, although McCaskill, like McBride, left the worksite without first obtaining supervisor approval on May 18, 2015, his was not a prolonged absence, it did not involve the additional offense of falsified documents, and he did not have a history of any prior disciplinary actions, let alone one for unauthorized absence (as did McBride). Moreover, he left to perform preventative maintenance at another metro station, a departure that WMATA permits without the need for prior approval. Thus, there was not a basis for disciplining him, let alone terminating his employment. Consequently, McBride and McCaskill are not "'similar in all relevant respects,' including . . . having 'engaged in the same conduct without [meaningful] differentiating or mitigating circumstances.'" *Caban*, 2019 WL 2146915, at *10 (quoting *Haywood*, 387 F. App'x at 359). And, due to all of these "confounding variables," McCaskill is not a proper comparator. *See Humphries*, 474 F.3d at 405; *Caban*, 2019 WL 2146915, at *10; *Bell*, 2018 WL 3008325, at *8.

*Mr. Eichen*

McBride states that "Mr. Eichen was not found at the Southern Avenue Station garage testing standpipes or performing preventative maintenance checks as he had been assigned[;] instead he was found outside of the complex asleep in his vehicle." Pl.'s Opp'n 13. WMATA agrees that "Mr. Eichen's misconduct was that he was found asleep in a personal vehicle on site at CTF." Def.'s Reply 5; *see also* Jordan Dep. 7:9–13 (stating that Eichen "was discovered sleeping in his vehicle on WMATA premises" while he was supposed to be working). Thus, Eichen, like McBride, had engaged in misconduct on May 18, 2015. And, like McBride, Eichen had been

13

disciplined before, albeit only once, in about February 2015, when he "left the worksite unauthorized" and was given a one-day suspension. Jordan Dep. 12:1–13:16. Based on the disciplinary matrix, his supervisors suspended him for five days for his conduct on May 18, 2015. *Id.* at 8:9–10:1.

McBride argues that Eichen's discipline was far less than his own termination of employment, and this is true. But, McBride admits that "[w]ith respect to the evening shift beginning on May 17, 2015, . . . Mr. Eichen [was not] accused of falsifying shift logs or of unauthorized absence(s) from the worksite while on shift at WMATA." Pl.'s Resp. to Stmt. ¶ 20; *see* Def.'s Stmt. of Facts ¶ 20.

Certainly, McBride contends that "there are facts from which a reasonable fact finder could determine that th[e] charge [of falsification of documents] is a contrivance as well as an artifact of Defendant's discriminatory conduct." Pl.'s Opp'n 11. Yet, while he rationalizes the inaccuracy of his trip log, he does not provide any justification for the inaccuracy of his daily activity record. Moreover, as noted, WMATA considered sleeping *at* CTF, as Eichen did, to be a "less severe" offense than leaving the worksite for "personal business," as McBride did. Jordan Dep. 37:13–20. Indeed, McBride's termination letter stated that he was terminated "[a]s a result of [his] *gross* misconduct and [his] continued inability to follow workplace rules." Term. Ltr. (emphasis added).

In sum, WMATA's investigation revealed that McBride falsified his daily activity log and, at least at the time WMATA retrieved it, his trip log was inconsistent with his daily activity log and the surveillance video, whereas Eichen did not falsify any documents; McBride had three past disciplinary actions, whereas Eichen had only one; McBride left the premises for personal business, whereas Eichen was on site at CTF; and there was no delay in finding Eichen, as there was with McBride. These differences militate toward a harsher disciplinary action under

WMATA's matrix. Consequently, Eichen also is not a proper comparator because he and McBride are not similarly situated. *See Humphries*, 474 F.3d at 405; *Caban*, 2019 WL 2146915, at \*10; *Bell*, 2018 WL 3008325, at \*8. Further, considering all of these facts in the light most favorable to McBride, no "reasonable juror could conclude that illegal discrimination was a motivating factor" in WMATA's decision to terminate McBride's employment but not Eichen's or McCaskill's. *See U.S. Equal Employment Opportunity Comm'n v. Dimensions Healthcare Sys.*, No. PX-15-2342, 2016 WL 4593470, at \*3 (D. Md. Sept. 2, 2016) (citing *Sawicki v. Morgan State Univ.*, No. WMN-03-1600, 2005 WL 5351448, at \*6 (D. Md. Aug. 2, 2005), *aff'd*, 170 F. App'x 271 (4th Cir. 2006)). Because McBride has not identified a proper comparator or other circumstantial or direct evidence of discrimination, I will grant summary judgment in WMATA's favor. *See Linton*, 2011 WL 4549177, at \*5; *see also Bryant*, 333 F.3d at 545; *Dimensions*, 2016 WL 4593470, at \*3.

## **ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is, this 8th day of August, 2019, hereby ORDERED that

1. WMATA's Motion for Summary Judgment, ECF No. 28, IS GRANTED;

2. Judgment IS ENTERED in WMATA's favor; and

3. The Clerk SHALL CLOSE this case.

        /S/
Paul W. Grimm
United States District Judge

lyb